### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

```
------------------------------- x
JAMES A. HARNAGE,                :
                                 :
         Plaintiff,              :
                                 :
         v.                      :   Civil No. 3:16-cv-1659 (AWT)
                                 :
JANINE BRENNAN, DR. JOHNNY WU,   :
and LAURA WOODS-STINEY,          :
                                 :
         Defendants.             :
------------------------------- x
```

### MEMORANDUM OF DECISION

On August 25, 2020, the court held a bifurcated bench trial on two of the defendants' affirmative defenses, release (the Third Affirmative Defense) and waiver (the Sixth Affirmative Defense). The court finds for the defendants on both of these affirmative defenses, and its findings of fact and conclusions of law are set forth below.

### I.  FACTS

The plaintiff brought this lawsuit against defendants Janine Brennan, Dr. Johnny Wu, and Laura Woods-Stiney making claims about various aspects of his medical care related to prescription medications during the time he was incarcerated at the Corrigan Correctional Center ("Corrigan"). The plaintiff entered into a settlement agreement and release with the State of Connecticut, which by its terms became effective May 28, 2019 (the "Settlement Agreement").

In the Settlement Agreement, the State agreed to pay $3,000 into the plaintiff's Inmate Trust Account, agreed that the settlement payment was intended to satisfy 26 U.S.C. § 104(a)(2), agreed that the plaintiff would be provided with and permitted to keep a Nintendo 3DS-XL gaming system, and agreed that the State and its departments, agencies, and other organs would refrain from collecting or attempting to collect from the settlement payment any sum owed or claimed to be owed by the plaintiff. See Settlement Agreement Section 3.A.i., ii., iii. & v. In subsection 3.A.iv., the State agreed:

> Harnage shall be permitted to purchase and obtain the following items if he is approved for the items for medical reasons or justifications by Department of Correction medical officials. To be clear, this provision of the [Settlement] Agreement is contingent upon the medical approval and evaluation of Harnage by DOC medical officials, and the [Settlement] Agreement makes no promises or other representations as to what such medical officials' decision will be. Both parties agree instead that the medical officials' decision will be based on their medical judgment of Harnage's medical needs and that approval will not be unreasonably withheld:
>
> a. a second pillow; and
>
> b. approved sneakers and/or diabetic footwear.

The plaintiff agreed to execute a Form W-9 and return it to the State and to execute the Settlement Agreement and return it to the State. See id. at Section 3.B.i. & ii. The plaintiff also agreed:

> Effective upon the deposit of the Settlement Payment
> into Harnage's Inmate Trust Account, Harnage,
> individually and on behalf of his heirs, beneficiaries,
> successors and assigns, does herewith release, forever
> discharge, and covenant not to sue Releasees from all
> actions, causes of action, suits, claims, demands, or
> controversies, whether in law or equity, whether
> foreseen or unforeseen, whether known or unknown,
> whether accrued or not accrued, and of and from all
> direct or indirect claims, debts, damages and demands of
> every nature and kind, including attorneys' fees and
> costs, monetary and equitable relief, arising out of the
> events described in the complaint in the Lawsuit. For
> the avoidance of doubt, Harnage is not providing the
> Releasees with a general release.
> . . .
> Within ten business days of Harnage being notified of
> the deposit of the Settlement Payment into his Inmate
> Trust Account, Harnage shall deliver or cause to be
> delivered to the State a signed stipulation of dismissal
> of the Lawsuit. Such stipulation of dismissal shall
> recite and confirm that the dismissal is with prejudice
> and without costs to any party. For purposes of this
> Section 3.B.iv, delivery of the stipulation to Attorney
> Stephen Finucane shall constitute delivery to the State

Id. at Section 3.B.iii. & iv.

The $3,000 representing the settlement payment was deposited into the plaintiff's Inmate Trust Account on June 11, 2019, and on June 24, 2019 he was notified that the deposit had been made. After ten business days had passed, the plaintiff refused to deliver to the State a signed stipulation of dismissal, contending that the State had not satisfied its obligations under Section 3.A.iv. of the Settlement Agreement.

On July 1, 2019, the plaintiff was seen by Dr. Gerald Valletta at Garner Correctional Institution, where the plaintiff is incarcerated, for an evaluation of his medical needs. The State

arranged for the visit. When Dr. Valletta conducted his evaluation of the plaintiff's medical needs, he did not know that the plaintiff had entered into the Settlement Agreement, but rather simply knew that the Department of Correction wanted the plaintiff to be evaluated to see if he had a medical need for a second pillow and sneakers and/or diabetic footwear. Dr. Valletta conducted a normal clinical evaluation of the plaintiff for his chronic disease or illness concerns, including his diabetes. Dr. Valletta conducted a full physical examination of the plaintiff's body, including his feet, legs, hips and back. During the examination, the plaintiff told Dr. Valletta that he felt great. The doctor performed tests on the plaintiff's feet so he could determine whether the plaintiff needed specialty footwear of any kind. Dr. Valletta concluded that the plaintiff did not need any specialty footwear, and his medical opinion was that the footwear the plaintiff was wearing was medically adequate. The plaintiff brought up concerns about chronic pain and the need for a second pillow. Dr. Valletta informed the plaintiff that he saw no need for a second pillow but advised the plaintiff that he would order x-rays of the plaintiff's spine and hip to be sure. The plaintiff was x-rayed the next day, July 2, 2019, and Dr. Valletta reviewed the x-rays that day. The results did not change his initial assessment that the plaintiff did not have a medical need for a second pillow. Dr. Valletta found that the x-ray showed that the

plaintiff had only mild abnormalities, which was excellent for an adult male the plaintiff's age.

After the evaluation by Dr. Valletta, the State believed it was entitled to a signed stipulation of dismissal; the plaintiff disagreed. The State then arranged for a second evaluation and medical opinion. It was performed by Dr. Ricardo Ruiz, who worked at Cheshire Correctional Institution. On November 26, 2019, the State transported the plaintiff to Cheshire Correctional Institution for a medical evaluation by Dr. Ruiz. The State and the plaintiff had agreed that the plaintiff could select whatever documents and medical records he wished to be provided to Dr. Ruiz for his review in advance of this second evaluation. Those documents included a typed summary of the plaintiff's request and the reasons he wanted the items in question, which was created by or on behalf of the plaintiff, and selections from the plaintiff's medical chart and medical records. Dr. Ruiz also reviewed, before examining the plaintiff, the plaintiff's medical chart and electronic health record, which at that point included Dr. Valletta's notes from the July 1, 2019 evaluation and the July 2, 2009 x-rays.

Dr. Ruiz did not know that the plaintiff had entered into the Settlement Agreement with the State, but rather simply knew that the Department of Correction wanted the plaintiff to be evaluated to see if he had a medical need for a second pillow and sneakers

and/or diabetic footwear. Dr. Ruiz watched from three separate angles as the plaintiff walked back and forth in the exam room in the sneakers he was wearing for the purposes of evaluating the plaintiff's gait. The doctor measured the plaintiff's foot and confirmed that the size of sneaker he was wearing was appropriate. Dr. Ruiz examined the sneakers, paying specific attention to the soles to look for signs of abnormal wear and the tread. He concluded that the sneakers the plaintiff was wearing were medically adequate.

Dr. Ruiz examined the plaintiff's feet and conducted several tests on them to evaluate blood flow and ability to feel pressure. In addition, the doctor examined the blood vessels in the plaintiff's eyes because that was helpful in evaluating whether there was any progression of diabetes. In addition, the doctor evaluated the plaintiff's back and hip in connection with the question of whether he had a medical need for a second pillow. At the conclusion of his examination, Dr. Ruiz's opinion, based on his medical judgment, was that the plaintiff did not have a medical need for specialty or medical footwear, that the sneakers the plaintiff was wearing were medically adequate so he had no medical need for new, non-specialty sneakers or footwear, and that the plaintiff did not have a medical need for a second pillow.

On January 29, 2020, because the plaintiff had not delivered the signed stipulation of dismissal, the defendants amended their answer to plead the affirmative defenses of release and waiver.

## II.  DISCUSSION

The parties disagree about the proper interpretation of Section 3.A.iv. of the Settlement Agreement, and the plaintiff maintains that the State breached the Settlement Agreement and cannot rely on release as a defense after doing so. The parties also disagree about whether the release automatically became effective, pursuant to Section 3.B.iii. of the Settlement Agreement, once the settlement payment was deposited into the plaintiff's Inmate Trust Account.

### A. **The State Did Not Breach the Settlement Agreement**

When testifying under cross examination, the plaintiff testified that he believes that the Settlement Agreement entitles him to the sneakers or diabetic footwear and the second pillow even if the DOC medical officials determine there is no medical need for them. In his post-trial memorandum, the plaintiff argues that Dr. Valletta and Dr. Ruiz used the wrong standard during their evaluations. The plaintiff contends that the evaluations were improper because the doctors evaluated the plaintiff as they would have evaluated any other inmate and that, as the plaintiff testified, the Settlement Agreement "guaranteed me a better right to it than the average inmate would get. I was supposed to be

guaranteed it unless there was a medical reason that it would hurt

me." Bifurcated Bench Trial Tr. ("Tr.") at 107:11-16, ECF No. 239.

Under Connecticut Law,

> It is the general rule that a contract is to be
> interpreted according to the intent expressed in its
> language and not by an intent the court may believe
> existed in the minds of the parties. . . . When the
> intention conveyed by the terms of an agreement is clear
> and unambiguous, there is no room for construction. . .
> . [A] court cannot import into [an] agreement a different
> provision nor can the construction of the agreement be
> changed to vary the express limitations of its terms.

Yellow Book Sales & Distribution Co. v. Valle, 311 Conn. 112,

119 (2014) (alterations in original) (internal quotation marks

omitted) (quoting Levine v. Massey, 232 Conn. 272, 278 (1995)).

> In determining whether a contract is ambiguous, the
> words of the contract must be given "their natural and
> ordinary meaning." Kelly v. Figueiredo, 223 Conn. at 31,
> 35 (1992). A contract is unambiguous when its language
> is clear and conveys a definite and precise intent.
> Levine, 232 Conn. at 272. "The court will not torture
> words to impart ambiguity where ordinary meaning leaves
> no room for ambiguity." (Internal quotation marks
> omitted.) Id., at 279. "Moreover, the mere fact that the
> parties advance different interpretations of the
> language in question does not necessitate a conclusion
> that the language is ambiguous." (Internal quotation
> marks omitted.) Stephan v. Pennsylvania General Ins.
> Co., 224 Conn. at 758, 764 (1993).

United Illuminating Co. v. Wisvest-Connecticut, LLC, 259 Conn.

665, 670 (2002). "It is axiomatic that a party is entitled to

rely upon its written contract as the final integration of its

rights and duties." Yellow Book, 311 Conn. at 119 (internal

quotation marks omitted) (quoting Levine, 232 Conn. at 279).

Here, the language of Section 3.A.iv. is clear and unambiguous. The first sentence states explicitly that the plaintiff would be permitted to purchase and obtain the second pillow and the approved sneakers and/or diabetic footwear <u>if</u> he is approved for the items for medical reasons or justifications by Department of Correction medical officials. The second sentence emphasizes this point by stating explicitly that this provision is "contingent upon the medical approval and evaluation of Harnage by DOC medical officials." <u>Id.</u> The sentence then goes on to make it clear that there are no promises or representations being made as to what the medical officials' decision will be. The Agreement further expressly provides that both parties agree that the medical officials' decision will be "based on their medical judgment of Harnage's medical needs and that approval will not be unreasonably withheld." <u>Id.</u>

The plaintiff argues that unless this language is interpreted to mean that a different standard applies to the plaintiff than applies to other inmates, "Section 3(a)(iv) of the [Settlement] Agreement [is turned] into a dead letter -- an empty, illusory promise[.]" Pl.'s Post-Trial Mem. of Law Re Bifurcated Trial ("Pl.'s Post-Trial Mem.") at 8, ECF No. 241. That is not so.

Ordinarily, an inmate cannot obtain sneakers from outside the prison facility. The plaintiff testified that if an inmate begins his period of incarceration wearing a particular pair of sneakers,

he is permitted to keep those sneakers. However, if he wishes to obtain a new pair of sneakers, they must be purchased at the commissary using funds in the inmate's Inmate Trust Account.

Ordinarily, an inmate can purchase, at the commissary using funds in his Inmate Trust Account, the items the plaintiff wants. However, the plaintiff was not in a position to do so because the funds that were in the plaintiff's Inmate Trust Account were earmarked to pay other obligations, such as court filing fees. Even if a friend had sent the plaintiff money to put into his Inmate Trust Account, that additional money would also have been applied to pay such obligations. Thus, the plaintiff was not in a position to purchase a second pillow or a new pair of sneakers or diabetic footwear. Also, ordinarily an inmate is not permitted to have items like the second pillow and another pair of sneakers and/or diabetic footwear mailed to him by family members or friends from outside the prison. But with respect to the sneakers at least, the plaintiff was, under the terms of the Settlement Agreement, going to be allowed to have someone from outside the prison send him sneakers if the sneakers were approved for medical reasons or justifications by Department of Correction medical officials. Thus, the plaintiff did obtain a benefit under the interpretation of Section 3.B.iv. of the Settlement Agreement urged by the defendants.

In fact, a friend of the plaintiff purchased a new pair of sneakers for the plaintiff and sent them to the prison, where they have been held by prison officials because they have not been approved for medical reasons or justifications. These sneakers were produced by the plaintiff at trial.

Here, both Dr. Valletta and Dr. Ruiz concluded, after a thorough examination of the plaintiff and an assessment of his medical needs, that in their medical judgment he could not be approved for a second pillow or sneakers and/or diabetic footwear for medical reasons or justifications. Therefore, the State did not breach Section 3.A.iv. of the Settlement Agreement.

### B. **The Release Automatically Took Effect**

Section 3.B.iii. of the Settlement Agreement provides that the plaintiff "does herewith release, forever discharge, and covenant not to sue" the defendants "[e]ffective upon the deposit of the Settlement Payment into Harnage's Inmate Trust Account[.]" This language is clear and unambiguous. It is undisputed that the $3,000 settlement payment was deposited in the plaintiff's Inmate Trust Account on June 11, 2019. The effectiveness of the release set forth in Section 3.B.iii is not conditioned upon any other act or event. Therefore, the release took effect on June 11, 2019, and the plaintiff has waived any rights to pursue the defendants for the alleged conduct at issue in the underlying lawsuit.

**III.   CONCLUSION**

The defendants have proven that they are entitled to judgment in their favor on their Third Affirmative Defense, _i.e._ release, and also on their Sixth Affirmative Defense, _i.e._ waiver. Moreover, because the defendants are prevailing on these affirmative defenses, they are entitled to judgment in their favor on all claims in the plaintiff's complaint. The Clerk shall enter judgment accordingly.

It is so ordered.

Dated this 28th day of September 2020, at Hartford, Connecticut.

_____
/s/AWT
Alvin W. Thompson
United States District Judge